**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-625 APM** |
| | : | |
| **ROBERTO ADAMS,** | : | |
| | : | |
| **Defendant.** | : | |

**SUPPLEMENTAL MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 1
OR, IN THE ALTERNATIVE MOTION FOR A NEW TRIAL, AND MEMORANDUM
OF POINTS AND AUTHORITIES**

The Defendant, Roberto Adams, by and through undersigned counsel, respectfully moves

this Honorable Court, pursuant to Fed. R. Crim. P. 29, to enter a judgment of acquittal on Count 1

(Count 2 of the Second Superseding Indictment) charging Wire Fraud in violation of 18 U.S.C. §

1343 [hereinafter the "Motion"].  The Court reserved decision on Adams's Rule 29 motion at the

close of the government's evidence and permitted supplemental briefing after the verdict.  Because

no rational trier of fact could find beyond a reasonable doubt that Adams acted with the knowledge

and specific intent to defraud, the evidence is insufficient as a matter of law and the Court should

vacate the verdict and enter a judgment of acquittal.  In the alternative, if the Court denies the Rule

29 Motion, the defense requests a new trial pursuant to Rule 33(a) because the guilty verdict on

Count 1 is against the weight of the evidence.  In support of the Motion, undersigned states as

follows:

**BACKGROUND**

This case was set for retrial after remand from *United States v. Adams*, 139 F.4th 931 (D.C.

Cir. 2025) after the D.C. Circuit affirmed this Court's decision to grant Defendant's Motion for a

New Trial.  In the original trial, the jury returned a split verdict on then-Count 1 (wire fraud) (not

guilty), Count 2 (wire fraud) (guilty), and Count (3) (expenditure money laundering)(guilty).[1]  At the close of the government's case, and again at the close of all the evidence, Adams moved for a judgment of acquittal under Rule 29, arguing that the evidence—viewed even in the light most favorable to the government—was insufficient to establish that he acted with the intent to defraud. The Court elected to reserve decision both at the end of the government's case and at the renewed motion at the close of all evidence.  The jury thereafter returned a verdict finding Adams guilty of Count 1 (wire fraud) and not guilty of Count 2 (expenditure money laundering).  The Court then granted undersigned counsel an extension of time for thirty days to brief any post-trial motions including a supplement to the Rule 29 motion.  This supplemental memorandum addresses the reserved motion as to Count 1 and requests a new trial in the alternative.

### FACTS

The government presented six witnesses in its case in chief.  On June 2, 2026, the government presented Nora Hobbie and Erika Hoppes who were both attorneys at the Small Business Administration.  After Erika Hoppes, the government called Metropolitan Police Department Internal Affairs Agent Gary Ciapa and Seattle Police Department Sergeant Carl Wilson.  The government then presented tax preparer George Buckmon.  Finally, the government began the testimony of Federal Bureau of Investigation Agent Clint Hemberg.  On June 3, 2026, the government continued FBI Special Agent Clint Hemberg whose testimony concluded on June 4, 2026 and then rested its case-in-chief.  On June 4, 2026, the defense called its sole witness, Officer Jacoby Taylor of the Metropolitan Police Department.  The government did not present a rebuttal.

---

[1] Throughout the Motion, undersigned refers to former Count 2 and Count 3 as Count 1 and Count 2 consistent with the verdict form in this trial.

The defense does not dispute, and has never disputed, that Adams was not eligible for the Paycheck Protection Program (PPP) loans at issue or that he spent most of the proceeds on non-business expenses. The sole contested issue at trial was Adams's knowledge and intent—specifically, whether he knew of, authorized, or participated in the false statements that a third party, Gerrika Bunche, placed in the loan applications she prepared, signed, and submitted on his behalf.

Nora Hobbie

Ms. Hobbie is an attorney-advisor at the SBA's disaster lending processing center who reviewed Adams's file at the U.S. Attorney's Office and F.B.I.'s direction. Tr. 77:24-79:1 She acknowledged the government was pushing out "trillions" of dollars during the pandemic (Tr. 84:7-10) and that a startup business could apply for an SBA loan—just not an EIDL loan. Tr. 85:8-11. She further testified on direct that the Economic Injury Disaster Loan (EIDL) application filled out by Adams listed SuperKlean LLC along with its EIN number, $0 in gross revenue, $0 cost of goods sold, five employees, and a June 12, 2020 establishment date. Tr. 63:1-67:22. She further testified on cross-examination that no supporting documentation was required and that the SBA relied solely on the applicant's entries. Tr. 87:19-22. She testified that had Adams wished to defraud the program, he could have entered an earlier formation date or fabricated revenue to improve his odds of approval and did not. Tr. 88:20–90:8. She further conceded she did not know whether Adams understood the regulations or even read the instructions of the application. Tr. 95:18-96:5. This witness had no knowledge and did not testify regarding Adams's knowledge and intent when Bunche submitted the January, 2021 PPP loan application.

Erika Hoppes

The government's second witness was SBA Office of  General Counsel attorney who oversees the agency's defense of PPP loan-forgiveness denials.  Tr. 103:1-8.  She explained that to be eligible for a PPP loan a business had to exist as of February 15, 2020, have paid employees, wages, and payroll taxes.  Tr. 104:14-105:7.  Second draw loans, according to Ms. Hoppes, had an additional requirement to show a 25% reduction in gross receipts.  Tr. 122:18-22.  On cross-examination, she testified that an "authorized representative" or agent could complete and sign the application on the borrower's behalf, and no regulation required the agent to identify themselves or sign their own name.  Tr. 134:18-135:2; 148:17-149:9.  She acknowledged, however, that agent-fee rules prohibit the agent from collecting a fee from the applicant and must be paid by the lender.  Tr. 139:18-23.  She further acknowledged that agent fees were capped at one percent for loans under $350,000 and that collecting five to twenty percent fees would be illegal.  Tr. 139:24-142:25.

Consistent with Ms. Hobbie's testimony, Ms. Hoppes acknowledged that the SBA relaxed its usual fraud detection safeguards by not reviewing the applications and allowing lenders to rely on a good-faith review of the certifications in the application to "get the money out fast."  Tr. 145:4-14.  Additionally, Ms. Hoppes testified that the SBA guaranteed the loans 100% as long as the bank complied with the good faith review requirement which generally just required them to look at the "documents and see if they made sense."  Tr. 146:5-7; 146:23-147:7.  She acknowledged this system where the SBA relaxed lending restrictions did not have a mechanism to trace false certifications made by an agent unbeknownst to the borrower back to an agent if that agent signed the applicant's name.  Tr. 155:8-156:16.  She also testified that a sole proprietor could use their PPP loan as "owner-compensation replacement" to pay themselves and that, once paid, no rule dictated how the funds had to be spent nor prohibited spending the proceeds on personal expenses.  Tr. 152:17-153:13.  Ms. Hoppes could not testify to what Bunche told Adams about the

PPP loan requirements.  Tr. 157:10-20.  This witness had no knowledge and did not testify regarding Adams's knowledge and intent when Bunche submitted the January, 2021 PPP loan application.

### Officer Gary Ciapa

Ciapa testified regarding Adams's time and attendance and outside employment records. According to Ciapa, January 2021 was the period immediately following January 6, and Adams was performing his sworn Civil Disturbance Unit duty in the District.  Tr. 193:12–194:13.  Ciapa testified that Adams did not update his outside employment records when he formed SuperKlean in June 2020.  Tr. 174:24-182:2.  He testified that a business with no income did not have a financial conflict with MPD.  Tr.197:10-198:12.  He also agreed that a finding that an officer did not comply with a general order is not the same as a finding that the officer intended to deceive anyone.  Tr. 199:7–19.  This witness had no knowledge and did not testify regarding Adams's knowledge and intent when Bunche submitted the January, 2021 PPP loan application.

### Sergeant Carl Wilson

Seattle Police Department Sergeant Carl Wilson performed Adams background investigation when he applied for a job with the Seattle Police Department in 2021.  He testified on direct that Adams did not disclose SuperKlean or the PPP loan in his written history packet or during his interview.  Tr. 215:6-15; 221:6-13.  He learned of the loan through a Google search of Adams's name and found a website for SuperKlean.  Tr.228:24-229.8; 241:3-9.  Adams responded to Wilson's inquiry about the loan in Government Exhibit 130 on June 2, 2021 and states: "My kids and I have a cleaning company called SuperKlean LLC. It is a janitorial cleaning business. The amount of the loan was $18,345 and the terms were 60 months at 1.0 percent interest.  The

purpose of the loan was to provide relief and assistance for my small business during the pandemic." Tr. 230:11–16; Gov. Ex. 130.

On cross, Wilson acknowledged Adams's background investigation revealed he made poor financial decisions, had a prior bankruptcy, and "said he didn't understand" the consequences of bankruptcy. Tr. 233:3-236:3. He testified further that he had no clue what occurred during the interval of time between when he emailed Adams asking about the loan on June 1, 2021 at 5:05 p.m. and Adams responded on June 2, 2021 at 11:01 a.m. Tr. 238:15-239:24. The loan had been obtained in January 2021, five to six months earlier, and Wilson testified he had "no knowledge of what Adams understood about the loan back in January of 2021." Tr. 240:25–241:2.

George Buckmon

The government called tax preparer George Buckmon next who had prepared Adams's 2019 and 2020 personal tax returns and SuperKlean's business return (that was not ultimately filed). Tr. 250:2-253:23. Because Adams organized SuperKlean as an LLC, its return was a 1065, not a sole-proprietor Schedule C. Tr. 258:17-259:23. Buckmon did not prepare and did not recognize Government Exhibit 22, the schedule C Bunche created. Tr. 261:18-262:2. Adams sought out professional tax help and relied on Buckmon's expertise and the 1065 created by Buckmon showed $0 gross receipts, $0 gross profit, and $0 in total income. Tr. 256:16-257:21.

Special Agent Clint Hemberg

The government's primary witness was Special Agent Clint Hemberg of the Federal Bureau of Investigation, who testified as the summary witness for the investigation. Hemberg's testimony revealed that Ms. Bunche ran a substantial operation where the FBI obtained approximately 82 PPP loan applications submitted through Bluevine that were connected to her IP address, of which 34 were funded. Trial Tr. 684:16–685:8. Agent Hemberg acknowledged that the FBI recovered

a large number of Schedule C tax documents saved on Ms. Bunche's computer.  Tr. 613:22–614:2. He further acknowledged that Ms. Bunche operated outside the rules governing loan agents by collecting success fees directly from applicants, charging fees in excess of what the regulations permitted, and took payment from the loan proceeds, tr. 677:7–682:3, which Ms. Hoppes testified was illegal.  Tr. 139:24-142:25.  Hemberg acknowledged he learned through te investigation that Adams came to know Ms. Bunche through his Metropolitan Police Department partner, Jacoby Taylor, who had been friends with Ms. Bunche since approximately 2012.  Tr. 600:5–14.

**Bunche Tightly Controlled the Application Process.**

Agent Hemberg testified that he could tell the jury "with a great deal of certainty that Gerrika Bunche signed the loan application on Roberto Adams' behalf," and that the FBI "ruled out the possibility that Mr. Adams is the one who signed it."  Trial Tr. 575:9–16.  That conclusion rested on forensic digital evidence.  The FBI obtained IP address records from Bluevine, traced them through the internet provider, Charter Communications, and confirmed the address belonged to Ms. Bunche in North Carolina.  Tr. 575:17–576:7.  Adams's employment and bank records, by contrast, established that he was in the District of Columbia, Maryland, and Virginia area at the time both applications were submitted.  Tr. 576:13–17.  Agent Hemberg accordingly agreed that, "based on that extensive investigation," the FBI "were able to rule out the possibility that it was Adams himself who signed the documents," and that "Gerrika Bunche filled out and submitted the application."  Tr. 576:19–22; 577:20–22.

The record further reflects that Ms. Bunche—not Adams—controlled the Bluevine account.  Agent Hemberg acknowledged that Ms. Bunche created the Bluevine account and created its password.  Trial Tr. 597:22–598:5.  The IP login records, summarized in Government Exhibit 13A, confirmed that every login associated with both applications, including the entire second-

application filing window in January 2021, was Bunche's. Tr. 764:14–766:5. The false figures likewise originated with Ms. Bunche. Agent Hemberg testified that Ms. Bunche created the Schedule C the FBI found on her computer, and that the same Schedule C "was ultimately incorporated into the second loan." Tr. at 727:9–13. He agreed that Schedule C "was never found on any of Mr. Adams' devices that the FBI forensically searched," "was never found in the search warrant for Mr. Adams' Gmail account as an outgoing email to Ms. Bunche," and "was never found . . . in connection with Ms. Bunche's Gmail account as an incoming email from Mr. Adams." Tr. at 727:14–25.

Finally, Agent Hemberg agreed that Ms. Bunche never sent the application to Adams for his review before she signed and submitted it. Adams "never clicked on that button that said, 'accept offer,'" tr. 721:15–18, and, based on the IP, email, and other records, the FBI "ruled out all the possibilities to conclude that Ms. Bunche did not send the application to Mr. Adams to review in advance of her signing it." Tr. 722:9–16. Adams did not log into the Bluevine account at all until June 2, 2021—months after both applications were submitted. Tr. at 578:6–13.

**Everything Adams Transmitted Was Truthful.**

The record reflects that the only information Adams himself transmitted was accurate. He sent Bunche his true name, true Social Security number, date of birth, address, and citizenship, and a genuine copy of his own February checking-account statement. Tr. 579:11–580:24. Agent Hemberg agreed that "every single piece of information Mr. Adams sent to Ms. Bunche was truthful information." Tr. 580:9–13. He further agreed that, "throughout the exhaustive investigation that the FBI did in this case, it never found a piece of false information that Mr. Adams transmitted to Ms. Bunche," and that "everything that the FBI discovered in this case that Mr. Adams sent to Mrs. Bunche was truthful information." *Id.* at 581:9–18. The interstate wire

the government charged in Count 1 is "a text message originating from Mr. Adams . . . providing Mr. Adams' email address necessary to file" the application.  Tr. 956:23–957:3.  The charged wire was itself a transmission of truthful information and it was information Bunche already had from the first application.  Gov. Ex's. 89, 90, 91, 92, 94, 98, 99.

**No Evidence Adams Knew of the Loan's False Information.**

Agent Hemberg described an investigation that left little unexamined.  The FBI issued more than one hundred subpoenas, obtained bank and credit-card records, secured a search warrant for the full contents of Adams's Gmail account, executed a search warrant at his residence, and forensically searched all seven electronic devices it seized.  Tr. 566:21–568:17.  It also obtained Ms. Bunche's iMac, iPhone, and email, and phone records.  Tr. 570:11–572:25.  Agent Hemberg agreed that "[p]retty much the entirety of Mr. Adams' digital footprint was searched or obtained." Tr. 785:3–6.  That exhaustive effort produced no communication in which Adams supplied Ms. Bunche any false figure, no document showing he reviewed the application, and no evidence that he ever transmitted the fabricated Schedule C.  Tr. 581:9–18; 727:14–25.

**Bunche Gave Adams False Information About the Loan Requirements.**

The record also reflects that Adams and Ms. Bunche exchanged no text messages before July 31, 2020 when she solicited his business by email.  Tr. 573:5–16.  The email stated, in relevant part:

> Thank you for inquiring on additional information regarding the current programs available from the SBA.

> Please see the info below! After reviewing the info please feel free to give me ring or send me an email with any questions.

> Main Points:

9

Loan amounts are about $20k - $60k and forgivable. (The forgivable part is 100% up to you, more info HERE) Incorporated or not, I can mostly likely get you funded.

Due to the time and research required I do charge a 5% success fee once funded. Additionally you will receive a $500 referral fee if you refer someone and they get approved.

During the process it is important that you forward me any and all emails you receive related to funding from the lender in a timely manner. Funding usually takes 48-72 hours.
This is not a credit-based product. Your credit isn't ran but your identity will be verified.

Reasons you would not qualify: Already acquired an SBA PPP Loan, Delinquent on child support, currently filing bankruptcy or incarcerated.
FAQs are at bottom of this email.  Gov. Ex. 89.

Agent Hemberg agreed that Ms. Bunche's July 31, 2020 solicitation email—a form email she sent to dozens of prospective customers—was vague and inconsistent with SBA regulations.  Tr. 586-594.  He agreed that the email nowhere states that a business had to be in existence prior to February 2020, that it does not list the employee requirement, and that it does not tell the recipient how the loan proceeds must be spent.  Tr. 599:21–24; 599:15–20; 601:3–5.  He further admitted that "there [were] some key points about the program that were left out in the body of the email."  Tr. 599:25–600:3.  He further agreed that, because the email stated Ms. Bunche charged "a 5 percent success fee once funded," she would be paid only if the client obtained the loan—"if the client doesn't get the loan, she doesn't get paid."  Tr. 593:2–14.  And he acknowledged that the word "payroll" never appears anywhere in the email.  Tr. 602:20–22.  Finally, he testified that "[t]here's nothing in the email that says you have to have wage expenses to get" the loan.  Tr. 603:4–6.

**Bunche Ran a High Volume Operation**

Agent Hemberg acknowledged that the FBI's subpoena to BlueVine returned approximately 82 PPP loan applications that Ms. Bunche had processed through that provider alone. Tr: 684:17-20. He agreed that at least 34 of those applications were successful and represented loan proceeds that were actually paid out. Tr: 690:15-19. He further acknowledged that, in addition to BlueVine, Ms. Bunche obtained loans for people through other online providers such as Kabbage, whose records the FBI never obtained, so that the 82 BlueVine applications did not represent the whole universe of the loans she processed. Tr: 714:21-24.

He acknowledged that Ms. Bunche's solicitation email was a form email that she sent to dozens of prospective customers. Tr: 586:12-19. He agreed that her intake text message to Adams was likewise a template that appeared dozens if not hundreds of times in her communications and was saved in her phone's Notes application for copying and pasting. Tr: 609:14-20. He acknowledged that she also solicited customer referrals through an online intake form called Cognito Forms. Tr: 609:22-25. He agreed that the FBI saw dozens of Cognito Forms submissions in her email. Tr: 611:23-25. He acknowledged that her operation was a referral-based business. Tr: 611:20-22. He further agreed that a large number of form Schedule Cs that she had prepared were found on her iMac. Tr: 613:22-25. He acknowledged that she created Schedule Cs for other clients for whom she obtained loans. Tr: 728:1-7.

He acknowledged that Ms. Bunche charged a success fee of at least 5 percent once a loan was funded. Tr: 683:13-17. He agreed that she paid a $500 referral fee to recruit new customers. Tr: 601:7-9. He agreed that she collected all of her fees directly from every applicant she worked for. Tr: 679:17-23. Agent Hemberg acknowledged that Ms. Bunche signed the individual applicant's name across the dozens of applications the FBI reviewed. Tr: 681:16-25. He agreed that she submitted those applications through her own computer on her own IP address. Tr: 679:9-

12.  He acknowledged that, because she signed the applicants' names and submitted from her own IP address, the lending bank had no way to know of her identity.  Tr: 682:1-3.  He agreed that she used the same password, "LeBron23," for all of the PPP accounts she controlled.  Tr: 769:14-17.  He acknowledged that, across Ms. Bunche's applications, the average-monthly-payroll figures clustered in a consistent band of roughly $4,875 to $8,333.  Tr: 694:2-11.  He agreed that every application listed either zero or one employee.  Tr: 693:14-16.  He further acknowledged that Ms. Bunche submitted applications for herself, for her husband Terrence Bunche, and for her own company, Mom Redefined.  Tr: 695:24-696:8.

Officer Jacoby Taylor

The defense called one witness, Metropolitan Police Department Jacoby Taylor, Adams's former police partner.[2]  On direct, he testified that he has known Adams since 2015 and they served as partners at the Metropolitan Police Department after meeting in the academy.  Tr. 831.  Officer Taylor acknowledged that he and Adams had a trusting relationship in which he considered Adams a brother.  Tr. 832.  This trust extended to their families to the extent they each trusted each other with their own children who had sleepovers.  Tr. 833:9-16.  Taylor met Bunche in 2010, 2011 and he acknowledged he referred to Bunche in front of Adams as his best friend.  Tr. 834: 11-16. Taylor further testified despite having conversations with Bunche while Adams was present that he never heard Adams tell Bunche SuperKlean had income, employees, was in effect prior to February 2020, or discuss "anything at all" about "business financials.  Tr. 839:16-840:11.

---

[2] This summation of defense witness Officer Jacoby Taylor is submitted for consideration in Section II *infra* the Motion for a New Trial pursuant to Rule 33(a).  The Court need not decide whether that testimony also forms part of the record on the reserved motion for judgment of acquittal, because the government's case-in-chief is insufficient standing alone.  Rule 29(b) requires the Court to "decide the motion on the basis of the evidence at the time the ruling was reserved."  *See also*, *United States v. Wahl*, 290 F.3d 370, 374 (D.C. Cir. 2002).  The defense renewed the motion, however, and the Court also reserved so the defense position is two separate Motions for Judgment of Acquittal are pending but that the Court has sufficient basis to grant the first oral motion raised at the close of the government's case.

**STANDARD OF REVIEW**

A judgment of acquittal is required where "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Due Process Clause of the Fifth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "In considering a challenge to the sufficiency of the evidence to support [a] conviction, we must view the evidence in the light most favorable to the government and accept the jury's guilty verdict if we conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Saffarinia*, 101 F.4th 933, 939 (D.C. Cir. 2024) (cleaned up). The court must "accord[ ] the government the benefit of all legitimate inferences." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). Granting a motion for judgment of acquittal after a jury verdict is appropriate only where "a reasonable juror must necessarily have had a reasonable doubt as to the defendant['s] guilt." *Id.*

The Court, however, must take a hard look at the evidence and accord the government the benefit of only "legitimate inferences." *United States v. Recognition Equip., Inc.*, 725 F.Supp. 587, 588 (D.D.C. 1989) (citing *United States v. Singleton*, 226 U.S. App. D.C. 422, 702 F.2d 1159, 1163 (D.C. Cir. 1983)). The Court is not required to view the evidence through dirty window panes and assume that evidence which otherwise can be explained as equally innocent must be evidence of guilt. *Id.* The Court should not "indulge in fanciful speculation or bizarre reconstruction of the evidence." *Id.*

To convict Adams of wire fraud, the government was required to prove beyond a reasonable doubt that he "knowingly and willingly entered into a scheme to defraud" and that "an interstate wire communication was used to further the scheme." *United States v. Tann*, 532 F.3d 868, 872 (D.C. Cir. 2008); *United States v. Alston-Graves*, 435 F.3d 331, 337 (D.C. Cir. 2006). Consistent with that requirement, the Court instructed the jury that the government had to prove that Adams devised or intended to devise a scheme to defraud by means of materially false pretenses, that he "did so with the intent to defraud," and that he "knowingly and deliberately caused the transmission" of the wire in furtherance of the scheme. Tr. 951:17–952:5. To act with "intent to defraud," the Court instructed, "means to act knowingly and with the specific intent to deceive and cheat." *Id.* at 953:3–5.

Because the defendant must act knowingly and with the specific intent to defraud, "[g]ood faith is a complete defense." *United States v. Howard*, 245 F. Supp. 2d 24, 38 (D.D.C. 2003) (RBW). A defendant's mistake of law or subjective belief that he was not acting fraudulently precludes conviction. *See United States v. Hunter*, 554 F. App'x 5, 9 (D.C. Cir. 2014). But because it is often "near impossible to establish the requisite mens rea through direct evidence, . . . proof must be inferred from circumstantial evidence instead." *United States v. Vega*, 826 F.3d 514, 523, (D.C. Cir. 2016) (per curiam).

**ARGUMENT**

The Court should vacate the guilty verdict on Count One in this case and enter a judgment of acquittal. No rational juror could have found that the government proved beyond a reasonable doubt several essential elements of wire fraud, including causation, contemporaneous knowledge and intent to defraud, and material falsity attributable to Adams. The "key disputed issue" at trial was whether Adams "knew and intended" for Bunche to submit on his behalf Paycheck Program

14

loan applications that contained false information. *United States v. Adams*, 139 F.4th 931, 939-941 (D.C. Cir. 2025). On that issue, the uncontradicted record establishes that a third-party agent, Bunche, independently authored, signed, and submitted the false application without Adams's knowledge. Every piece of information Adams transmitted to Bunche was true. The trial evidence established facts fundamentally inconsistent with the government's theory and the Second Superseding Indictment.

To convict, the jury impermissibly bridged a key evidentiary gap with speculation—inferring knowledge, causation, intent, and materiality from absent evidence. The government's reliance on Adams's spending of the loan proceeds and on a statement he made to the Seattle Police Department more than four months after Bunche submitted the application cannot supply the knowledge and specific intent that must exist at the inception of the scheme and transmission of the charged wire. Nevertheless, if the Court finds the government barely satisfies this exacting standard, it should act in the interest of justice and grant a new trial because the weight of the evidence did not support a conviction.

## I.    THE COURT SHOULD VACATE THE VERDICT AND ENTER A JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE OF KNOWLEDGE AND SPECIFIC INTENT.

The Court should vacate the guilty verdict and enter a judgment of acquittal because the government failed to present a single false statement, material misrepresentation, or material omission attributable to Adams. 18 U.S.C. § 1343 states, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

15

A misrepresentation is material if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important. *Kousisis v. United States*, 605 U.S. 114, 131 (2025). In this case, no reasonable juror could have found beyond a reasonable doubt that Adams devised or intended to devise a scheme to defraud because the government never connected the Bunche's materially false claims back to Adams. The government failed to produce evidence that Adams made any false statements concerning the second-draw PPP application's certifications and no evidence connected him to the fabricated Schedule C. The government's case required the jury to impermissibly speculate that he transmitted the false figures and information to Bunche used in the application despite a record devoid of evidence to support that fact.

Because the government failed to connect Bunche's material falsity to Adams, it failed to prove the element of intent. Furthermore, the record is devoid of evidence Adams knew about the scheme to defraud or knowingly participated in it, which explains the absence of false statements despite the FBI's exhaustive investigation in this case. It is true that the standard for overturning a guilty verdict on the grounds of insufficiency of evidence is a demanding one. *United States v. Scott*, 150 F.4th 580, 588 (D.C. Cir. 2025). Yet, where the record is devoid on a core element, acquittal is not merely a permissible remedy—it is legally mandated. D.C. Circuit precedent strictly prohibits a jury from substituting conjecture for proof. And, on this record, the Constitution commands it.

### A. THE GOVERNMENT FAILED TO PRESENT EVIDENCE ADAMS CAUSED BUNCHE TO SUBMIT A FRAUDULENT APPLICATION.

The government failed to present sufficient evidence for a rational juror to conclude it proved Adams caused Bunche to submit the false figures and certifications in the application on his behalf. Given the FBI's exhaustive investigation in this case, for such an evidentiary gap to

exist, the Court should grant the motion and find, as a matter of law, the government presented legally insufficient evidence in this case. At trial, there was "no evidence that Adams provided Bunche the information she needed to make the certifications" in the application. *Adams*, 139 F.4th at 939. There was no evidence of Adams telling Bunche that (i) SuperKlean was in operation on February 15, 2020, (ii) SuperKlean had employees for whom it paid salaries and payroll taxes, or (iii) the uncertainty of pandemic economic conditions made the loan necessary to support SuperKlean's ongoing operations." *Id.* There was no evidence Adams told Bunche he spent the proceeds of the first draw loan on required business expenses like rent and payroll. There was no evidence Adams told Bunche he had gross income of $94,520 (Tr. 749:4-8), or that they spoke on the telephone prior to her filling out the application (*Id.* at 9-12), or that he had an average monthly payroll of $7,338 (*Id.* at 749:16-22) or that his business suffered a reduction in gross revenue.

In the first trial, the government attempted to bridge this evidentiary gap by claiming Adams and Bunche must have communicated via Facetime—despite having no evidence of such a call. Even on that record, however, the D.C. Circuit noted for the jury to "buy the government's theory of the case" the jury would have to stack inference upon inference "first to infer that Adams and Bunche exchanged Facetime calls despite the absence of any evidentiary record of them" then "infer that in providing Bunche truthful information, Adams also provided false information" and then "reject Adams argument that Taylor" gave Bunche information or that "Bunche herself fabricated the false numbers." *Adams*, 139 F.4th at 940-941. Notably, in the retrial, the Court prohibited the government from arguing that Adams and Bunche had a phantom Facetime call. Accordingly, the jurors had to take a greater inferential leap over an even larger evidentiary gap to conclude Adams conveyed the false loan application information to Bunche causing her to submit false figures and certifications on his behalf.

17

## B. THE FBI'S EXHAUSTIVE INVESTIGATION PRODUCED NO EVIDENCE TO FILL THIS GLARING EVIDENTIARY GAP.

The trial court has a responsibility to the criminal justice system to grant a defendant's Rule 29 motion when the jury has no evidentiary basis for its action. *United States v. Campbell*, 702 F.2d 262, 267 (D.C. Cir. 1983). The breadth of the FBI's investigation in this case along with the depth of this evidentiary gap should compel the Court to conclude Adams's conviction on Count One is based on legally insufficient evidence. The FBI obtained essentially the entirety of Adams's digital footprint during the relevant period. Tr. 785:3–6. However, the government was unable to produce a single communication in which Adams supplied a false figure, a single document showing he reviewed the application Ms. Bunche filed, or any evidence that he transmitted the fabricated Schedule C. Tr. 581:9–18; 727:14–25; *Adams*, 139 F.4th at 940. Agent Hemberg agreed that Adams's "IP address record never appears during the submission, review, or approval of the loan," and does not appear "at all while the money is being spent." Tr. 769:1–7. Moreover, Agent Hemberg conceded the F.B.I. never investigated whether any of the other Schedule C's found on Bunche's computer matched the tax returns of the clients they described. Tr. 750:12-15. The government looked everywhere for evidence of a Adams knowledge and finds nothing. It then left an obvious alternative source uninvestigated. That absence is not a gap for the jury to fill. The absence of that evidence demonstrates that the government has, as a matter of law, failed to meet its burden of proof as to that element.

Unable to point to any false statement by Adams, the government invited the jury to simply guess at how Bunche got the name SuperKlean with a "K" and then engage in exactly the kind of fanciful speculation the D.C. Circuit explicitly rejects in *Campbell* and *Recognition Equip., Inc.* and criticizes in *Adams*. But the record forecloses, rather than supports, that assumption. Ms. Bunche and Adams exchanged no communications before July 31, 2020, Tr. 573:5–16, and the

false figures appear nowhere in the communications the FBI did recover.  Tr. 727:14–25.  To find that Adams nonetheless conveyed the false information, the jury had to infer the existence of unrecorded conversations, then infer Adams gave Bunche the truthful name of the business SuperKlean then infer that Adams also supplied false information during them—at the same time he was demonstrably supplying only truthful information—then infer that he did so with the specific intent to deceive the lender and also infer that Bunche herself never left a trace of these communications.  Each inference is unsupported and compels a judgment of acquittal in this case.  While the most striking omission from the government's case, it is not its only evidentiary failure.

### C. THE GOVERNMENT'S "ONLY ADAMS COULD HAVE KNOWN 'SUPERKLEAN'" THEORY IS REFUTED BY ITS OWN EVIDENCE

Having conceded that it could produce no communication in which Adams supplied a false figure, the government offered the jury a single circumstantial bridge across that gap. It asked the jury to reason backward from the business name. Its closing argument put the theory as plainly as it can be put:

> You're not going to see a letter from Officer Adams to Ms. Bunche saying, hey, let's commit fraud today. But how do you know that he was giving her information, information that went into that loan application?  Look at that Schedule C form. That document contains information that only Officer Adams had.  Look at the name of the business, SuperKlean.  When you hear it, you think super clean, normal spelling.  It is unique.  It is one word with a big old "K" in the middle.  That is information only Officer Adams could have. It's not in any text message and it's not in any email.  You're not going to see that in the text messages or email. It was information that he had that he knew and that he gave to Ms. Bunche and that she included in these forms. He caused her to include information, knowing that he was not allowed to get this loan.  TR. 972:15-973:6.

That argument sums up the entirety of the government's evidence that Adams was the source of the false information Bunche put in the loan application (Gov. Ex. 22).  It is not enough to sustain a conviction for fraud for multiple reasons.  First, the argument rests on an inference the record does not support, and even if the inference were true, it would prove nothing.  Even if

Adams told Bunche the true name of his business that only establishes Adams told Bunche additional truthful information. The fact Adams had a business called SuperKlean is not a false pretense, a misrepresentation, or a material omission. The government invites the jury to move from Adams told Bunche a true fact to Adams also supplied false facts. Second, the premise is false. The name SuperKlean with a "K" was not information the record demonstrates only Adams possessed.

The government's own witness, Sergeant Wilson, had no prior knowledge that Adams had a business or a loan. Tr. 229:4-8. But he learned about the business and the loan by performing a Google search of Roberto Adams name. Tr. 241:3-9. A stranger in the Seattle Police Department found SuperKlean with a name and an internet connection. Furthermore, the Schedule C Bunche fabricated (Gov. Ex. 22) excludes Adams as the source. Every business record Adams created himself uses the entity name "SuperKlean LLC" and used the proper EIN number, 85-1600504. Tr. 729:1-24; Gov. Ex. 2. On the other hand, Bunche uses a Schedule C form whereas Buckmon testified to creating a 1065 partnership return. Tr. 258:17-259:23. Buckmon did not prepare or recognize it. Tr. 261:18-262:2. Bunche's Schedule C uses Adams's social security number (instead of EIN), omits "LLC," and matches the pattern of client data consistent with what the FBI found on Bunche's iMac. Tr. 613:22-25 (form Schedule Cs on her iMac); 728:1-7 (created them for other clients); 694:2-11 (payroll figures clustered $4,875–$8,333); 693:14-16 (every application listed zero or one employee). Finally, the government did not eliminate alternative sources of information like Officer Taylor in its case.

"The record does not reveal how Bunche obtained the name and purpose of Adams' business or the financial figures she used in completing Adams' application." *Adams*, 139 F.4th at 939. Nothing in the retrial changed that. If anything, the retrial record is thinner because the Court

20

precluded the government from arguing that Adams and Bunche exchanged FaceTime calls, removing the only mechanism the government had ever offered for the transfer of information.

### D. THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE OF CONTEMPORANEOUS FRAUDULENT INTENT.

In addition to failing to present any evidence, Adams provided false information for the loan application to Bunche, the government failed to prove contemporaneous fraudulent intent. "To commit the offense, the defendant must have fraudulent intent at the time of the charged mailing: that is, he must both have a fraudulent scheme in mind and intend that the mailing further that scheme." *United States v. Haotian Sun*, 2026 U.S. App. LEXIS 1807 (D.C. Cir. January 23, 2026) (quoting *United States v. Coughlin*, 610 F.3d 89, 97 (D.C. Cir. 2010)).[3] In this case, the government charged that Adams initiated an interstate wire signal on January 21, 2021 at 9:16 AM from the District of Columbia to Bunche in North Carolina providing Adams's email address, necessary to file a false and fraudulent PPP loan application for $18,345. Second Superseding Indictment [E.C.F. 70 at 9A].

A wire transmission made without contemporaneous fraudulent intent, or prior to the formation of a fraudulent scheme in the defendant's mind, cannot support a conviction. *Id.* at 100. The mailing/wire, however, may be "innocent in and of itself" and "need not be an essential element of the scheme." *Schmuck v. United States,* 489 U.S. 705, 710-711 (1989). Nevertheless, because the Government introduced no evidence establishing that Adams possessed a specific intent to defraud at the moment this text was sent, this wire cannot legally sustain a conviction.

### E. THE GOVERNMENT'S EVIDENCE LED TO A SPECULATIVE VERDICT ON KNOWLEDGE AND INTENT.

---

[3] The requisite elements of scheme to defraud under the wire fraud statute, 18 U.S.C.S. § 1343 and the mail fraud statute, 18 U.S.C.S. § 1341, are identical. Thus, cases construing mail fraud apply to the wire fraud statute as well. *See, e.g.*, *United States v. Lemire*, 720 F.2d 1327, 1355, fn. 6 (D.C. Cir. 1983) (cleaned up).

The government similarly failed to present evidence of Adams' knowledge and intent at the time he sent the charged wire and never proved Adams entered into a scheme.  A conviction for wire fraud strictly requires the government to prove the "materiality of falsehood" as an essential element of the offense. *Neder*, 527 U.S. at 25.  The content of the charged wire was entirely truthful and innocuous.  Adams merely provided an email address to Bunche—which she already had from the first draw application (Gov. Ex's. 89, 90, 91, 92, 94, 98, 99)—to help her refresh how to locate the account she already created and controlled.  As the D.C. Circuit observed when evaluating the record of the first trial, "nothing in their exchanges speaks to Adams' knowledge of the legal preconditions for obtaining that second loan or indicates Adams' intent that Bunche submit fraudulent information to the government on his behalf." *Adams,* 139 F.4th 931, 940.

It is true that in evaluating a Rule 29 Motion, no distinction is made between direct and circumstantial evidence in evaluating the sufficiency of evidence supporting a guilty verdict. *See Holland v. United States*, 348 U.S. 121, 139-140 (1954).  But in this case, "the government asked the jury to make inference after inference at every turn." *Adams*, 139 F.4th at 940.  Accordingly, the Court is obligated to take a hard look at the evidence and accord the government the benefit of only "legitimate inferences." *United States v. Singleton,* 702 F.2d 1159, 1163 (D.C. Cir. 1983).  The absence of evidence in this case demonstrates that the jury reached an impermissible verdict based on "surmise and conjecture, without evidence." *Campbell*, 702 F.2d at 266.

No rational juror could find that the government proved Adams knowing participation in the scheme beyond a reasonable doubt.  The record is clear and undisputed that at the time of the charged wire transmission, Adams had never logged into the Bluevine portal, and he did not log in at any point during the loan's submission, review, or approval.  Bunche maintained exclusive

control of the account password and unilaterally submitted the application from an IP address in North Carolina. Because the record reflects Adams provided only truthful information to Bunche and no evidence was presented of him conveying false information to Bunche to use in the application, the jury impermissibly inferred that he gave her the information despite no record evidence to support that conclusion. On that unsupported inference, the jury further stacked an inference that he had the requisite knowledge and contemporaneous fraudulent intent.

### F. *POST-HOC* STATEMENTS MADE MONTHS LATER CANNOT PROVE CONTEMPORANEOUS INTENT.

Lacking evidence of Adams's contemporaneous intent at the time of the charged wire or knowledge of the scheme, the government relied heavily on an email Adams sent to Sergeant Wilson at the Seattle Police Department on June 2, 2021. Gov. Ex. 130. In this email, Adams described the loan was to "provide relief and assistance for my small business during the pandemic." *Id.* He also described the loan terms as 5 years at a 1 percent interest. *Id.* This evidence cannot be sufficient for a rational juror to conclude the government proved his knowledge and intent at the time of the charged wire beyond a reasonable doubt for two principal reasons. First, "Adams made that statement more than four months after Bunche submitted the second loan application" and Adams had sent the charged wire. *Adams*, 139 F.4th at 940.

Second, while he recited the accurate terms of the loan, it said nothing about "Adams' knowledge of the aspects of the Program as to which his application[] [was] false." *Id.* D.C. Circuit precedent, like *Coughlin* and *Haotian Sun* require contemporaneous intent so Adams's knowledge about the interest rate, term of the loan, and fact it was for pandemic era small businesses four months later shed no meaningful light on his intent when he sent the charged wire. Even if it did, Adams response said nothing about the loan eligibility requirements demonstrating he knew he did not qualify.

23

The government's evidence is further undermined by the undisputed fact that Adams only logged on to the Bluevine account for the first time immediately prior to sending that email. The email to Wilson was made more than four months after the second application was submitted. Tr. 582:18–583:9; 768:14–18. A truthful, after-the-fact description of accurate loan terms is not an admission that Adams intended, at the time the application was filed, to deceive the lender. In addition, the circumstances of that same morning show Adams learning the loan terms rather than directing the scheme. Agent Hemberg agreed that Adams's first-ever login occurred at 10:55 a.m. on June 2, 2021, immediately after Ms. Bunche—who "had control of that account from the time it was created"—texted him the account password, and that Adams responded to Wilson only afterward. Tr. 766:16–768:18. Agent Hemberg agreed he had no basis to conclude Adams knew the password before that date, Tr. 769:14–23, and, critically, he could not exclude the possibility that June 2, 2021, was "the first time he's learned the terms of the loan." Tr. 769:25–770:7. Asked whether June 2, 2021 might have been "the first time [Adams] learned the terms of the loan," Hemberg answered: "I don't know . . . I can't tell you one way or the other." Tr. 769:25–770:7.

Adams email to Wilson—the government's primary evidence as to Adams's "knowledge" of a fraud scheme—is made only after a third party gives him the password to see the loan for the first time and is evidence of his exclusion from the scheme—not proof that he knew it was based on false figures and fraudulent representations. Where the government's own summary witness cannot exclude the innocent explanations its own evidence leaves open, no rational juror could find the inculpatory inference proven beyond a reasonable doubt.

G. **THE GOVERNMENT'S OWN AUTHORITY CONFIRMS THAT IT HAD TO PROVE KNOWING PARTICIPATION, WHICH THE RECORD DOES NOT CONTAIN.**

24

In arguing the reserved motion, the government relied on *United States v. Maxwell*, 920 F.2d 1028, 1036 (D.C. Cir. 1990), and *United States v. Lanier*, 838 F.2d 281, 284 (8th Cir. 1988) for the proposition that a defendant working through an intermediary need not "perform[] every key act" himself. Tr. 821:8–822:6. That authority does not help the government in this case. Rather, it restates the requirement the government failed to satisfy. As the government itself noted, the evidence must show that the defendant "ha[s] knowingly and willingly participated in the scheme," and that he "participate[d] in a scheme knowing it was fraudulent." Tr. 821:18–822:3.

In *Maxwell*, the evidence showed that "appellant devised the scheme and furthered it by means of wire communications directly with the victims and indirectly via her intermediary." 920 F.2d at 1036. This scheme more closely tracked to the evidence in this case related to Bunche— rather than Adams. In *Maxwell*, the appellant solicited loan applications from a number of people by making false claims that she could procure risk free loans from offshore investors all while misrepresenting herself as a "Special Consultant" to the Treasury Department. *Id.* at 1030-1031. Bunche created a high-volume loan business soliciting loan applications from numerous people while misrepresenting herself as a legitimate PPP agent who in reality's entire business operation was illegal. Tr. 141:1-13. The *Maxwell* scheme involved making false promises. Bunche made false promises—forgiveness is completely up to you [Gov. Ex. 89]. Bunche, like the appellant in *Maxwell*, misrepresented in communications over interstate wires—"…revenue or transactions don't matter" [Gov. Ex. 89]. *Id.* at 1035.

Similarly, *Lanier* falsely represented to potential borrowers he could introduce them to brokers who could secure one hundred million dollar "no-payback loans" in exchange for advance fees that would be placed in escrow and refunded if unsuccessful. *Lanier*, 838 F.2d at 283. In other words, he made false promises to potential borrowers that were too good to be true.

25

Similarly, Bunche made false promises that borrowers that were too good to be true. For example, she claimed the only reasons they would not qualify were if they "Already acquired an SBA PPP Loan, Delinquent on child support, currently filing bankruptcy or incarcerated" [Gov. Ex. 89]— not if their business did not exist prior to February, 2020 or if they had no income yet.

Furthermore, the common thread fatal to the government's arguments regarding *Maxwell* and *Lanier* is that both courts found "substantial evidence" of the appellant's respective knowing participation and *false misrepresentations*. Here, again, the government presented no evidence Adams made any false statements or misrepresentations—material or otherwise. The only common thread between Adams and *Maxwell/Lanier* was the existence of an intermediary. However, using a loan processor is not unlawful. Nor is relying in good faith on a person holding themselves out as a legitimate loan agent. The question that remains unanswered is whether Adams knew the scheme was fraudulent and knowingly participated in it—and on that question the record is insufficient as a matter of law to support a conviction.

## H. **POST-DISBURSEMENT SPENDING CANNOT SUBSTITUTE FOR SPECIFIC INTENT AT THE INCEPTION OF THE ALLEGED SCHEME.**

Faced with an insurmountable evidentiary gap between Adams knowledge and intent and Bunche's actions in putting false information in the loan application, the government anchored its case in Adams post-disbursement spending on the first and second loan. Fraud requires much more than simply not following through on contractual or other promises. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016). It requires a showing of deception at the time the promise is made. *Id.* A subsequent breach, although consistent with deceptive intent, is not in and of itself evidence of such an intent. *Id*. The term "scheme to defraud' connotes some degree of planning by the perpetrator, so it is essential that the evidence shows the defendant entertained an intent to defraud." *United States v. Pintar*, 630 F.2d

26

1270, 1280 (8th Cir. 1980) (citations omitted). The mail and wire fraud statutes "do not cover all behavior which strays from the ideal." *United States v. Weimert*, 819 F.3d 351, 357 (7th Cir. 2016) (quoting *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000)). The defense has never denied that Adams spent the proceeds inappropriately nor claimed that his conduct was "ideal," but the government did not present sufficient evidence regarding falsity, materiality, and his knowledge and intent—let alone any degree of planning.[4] The government relied on after-the-fact expenditures to retroactively manufacture fraudulent intent at the time of the charged wire.

Nevertheless, Adams exhibited the same spending pattern when there were no PPP proceeds at all. Agent Hemberg agreed that Adams "spent money on gambling and going out to dinner when he did not receive PPP loan accounts," he went "on trips in months where he didn't have PPP loan proceeds," and "spent . . . almost every dollar he had in his account regardless of where the income came." Tr. 741:4–18. Spending that is constant across funded and unfunded months reflects impulsive spending habits, not a plan to defraud a lender contemporaneous with the charged wire. Furthermore, Agent Hemberg agreed that a substantial portion of the proceeds went to Adams's rent, that he did not know whether Ms. Bunche ever told Adams that rent was a permissible use, and that many of the government's own exhibits described rent as a permissible use of PPP proceeds. Trial Tr. 772:3–23. The government's failure to trace the proceeds means it did not establish that the loan funded the discretionary spending on which its intent theory rested rather than this ordinary expense. Tr. 743:15–744:9.

## II.  EVEN IF THE COURT DENIES THE RULE 29 MOTION, IT SHOULD GRANT A NEW TRIAL PURSUANT TO RULE 33

---

[4] That said, the government did not even prove Adams breached the PPP loan contract because it presented no evidence that he *knew* what the terms of the agreement were beyond that he knew the interest rate and term period four months after the loan was obtained and the proceeds were spent.

If the Court concludes the government's evidence technically clears the bare minimum threshold of legal sufficiency under Rule 29 and denies the pending Motion for a Judgment of Acquittal, it should exercise its discretion and grant a new trial in the interest of justice. Unlike the strict standard it must apply under Rule 29, the Court need not view the record in the light most favorable to the government when the verdict is against the weight of the evidence. Fed. R. Crim. Pr. 33(a) permits the Court to vacate any judgment and grant a new trial where "the interest of justice so requires." The interest of justice compels a new trial in this case for two separate reasons. First, the verdict is against the weight of the evidence. Second, the flawed first-loan instruction combined with the government's cumulative first loan spending presentation caused severe prejudice to the defense.

### A.  THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE.

A motion for new trial on the grounds that a verdict is against the weight of the evidence is committed to the trial court's sound discretion and may be reversed only for abuse of that discretion. *United States v. Dale*, 991 F.2d 819, 838 (D.C. Cir. 1993); *see also United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990); *United States v. Sensi,* 879 F.2d 888, 901 (D.C. Cir. 1989). Because the weight of the evidence demonstrates that Adams lacked the requisite knowledge and intent to commit fraud, letting the guilty verdict stand would result in a serious miscarriage of justice. Accordingly, the defense incorporates and adopts its arguments from Sections I *supra* under the discretionary standard set forth in Rule 33(a). If the Court denies the Motion for Judgment of Acquittal, the defense requests a new trial under the interest of justice based on the same arguments regarding the lack of evidence as to Adams knowledge and intent as well as unfair prejudice caused by the government's cumulative presentation on non-business expenditures from the first loan and the instruction on the First PPP Loan.

**B. THE GOVERNMENT'S CUMULATIVE PRESENTATION ON NON-BUSINESS EXPENDITURES FROM THE FIRST LOAN COMBINED WITH THE FIRST-LOAN INSTRUCTION PREJUDICED THE DEFENSE.**

Without any evidence that Adams knew of the false figures and certifications Bunche submitted, the government largely based its theory of intent on how he spent the money of the first PPP loan for which he was acquitted in the first trial.  In closing, the government argued that Adams "spent it on gambling, on airfare, on hotels, and on bar tabs," and then "went back" for a second loan.  Tr. 960:22–961:7.  The use of loan proceeds in a manner inconsistent with the program's requirements is, at most, a misuse of funds (or breach of a contract for which the record lacks any evidence he ever read or understood) and does not retroactively establish an intent to defraud at the time the charged wire was sent.  The government spent hours and dozens of exhibits painstakingly going through virtually every non-business transaction for both loans.

The government's elaborate and painstaking presentation on spending proved facts the defense did not and has never disputed.  The cumulative and lengthy presentation was highly prejudicial and likely caused the jury to impermissibly speculate as to his knowledge and intent despite an absence of evidence that Adams himself made false statements, material omissions, or false pretenses.  That prejudice was further compounded by the jury instruction regarding the acquitted first loan.

The defense proposed a limiting instruction on the acquitted first-draw loan. Tr. 849:1-15.  The government asked that the jury be affirmatively told it could consider first-loan spending. Tr. 850:5–9; 865:1-4.  The defense objected noting the instruction's purpose "is to protect him from the fact that he was acquitted on the first charge." Tr. 865:15-18.  The Court proposed a while you may consider the spending from the first loan clause. Tr. 867:11-16.  The defense repeatedly objected on the record noting that "if there's going to be language explicitly telling the jury they

can consider evidence I don't think they're going to be confused about whether they can consider, it's going to have to be over my objection." Tr. 867:19-25.  The defense renewed its objection the next morning at the final charging conference.  Tr. 933:12-16.

The Court nevertheless inserted a sentence calling attention to the spending of the first loan proceeds in what was supposed to be a prophylactic instruction regarding the acquitted (original) count 1 from the first trial.  Tr. 866-868; Final Jury Instruction p. 9.  The instruction as delivered told the jury it could not use first-loan evidence for bad character or criminal personality, that "the law does not allow you to convict the defendant because you believe he may have done something wrong on some other occasion" and then closed with "[t]his instruction does not apply to evidence concerning the expenditure of the first draw PPP loan proceeds." Tr. 948:7-949:2.  The Court's carve-out sentence basically exempted the government's most salacious, cumulative, and prejudicial evidence from the  prohibition against use of evidence for propensity reasons.  In other words, the sentence gave the jury permission to use the most inflammatory evidence, yet marginally probative evidence, as bad character evidence against Adams.  The prejudice is particularly acute where Adam was acquitted on the first loan.

The government then seized the opportunity by highlighting "Vegas. Hangover cures.  He burns through the money within a matter of weeks." Tr. 1013:8-9.  "[H]e went, got the money, went to Vegas, went to Miami, burned through the money, hangover cures, bar tabs, and then went back for more." Tr. 1014:15-18.  The defense does not contend that the Court erred in admitting evidence of how the first-draw proceeds were spent.  He contends that the volume and character of that presentation, combined with a final instruction that expressly withdrew from the spending evidence the very protection the instruction was written to supply, rendered the verdict against the interest of justice.  The objection to that instruction was lodged and twice preserved. Tr. 867:19–

30

25; 933:12–16. In sum, the jury did not convict Adams because the government proved intent beyond a reasonable doubt. Rather, the combination of inflammatory and needlessly cumulative evidence with a flawed instruction—that was supposed to be curative—invited them to punish him for how he spent the money.

## CONCLUSION

The sole contested issue at trial was whether Officer Adams knew of and intended the false certifications that Gerrika Bunche authored, signed, and submitted. On that issue the government presented no evidence. It presented no communication in which Adams supplied a false figure, no document showing he reviewed the application, no evidence that he ever possessed or transmitted the fabricated Schedule C, and no trace of his participation in the submission, review, or approval of the loan. The FBI obtained "[p]retty much the entirety of Mr. Adams' digital footprint," and its case agent conceded that "every single piece of information Mr. Adams sent to Ms. Bunche was truthful information." What that exhaustive investigation did not find is not a gap for a jury to fill by inference. It is a failure of proof.

To reach its verdict, the jury was required to infer the existence of communications the record does not contain, infer that Adams supplied false information at the very moment he was demonstrably supplying only truthful information, infer that he did so with the specific intent to deceive a lender, and infer that neither he nor Ms. Bunche left any trace of it — while rejecting, without evidence, the alternative sources the government never eliminated. That is not circumstantial proof. It is "inference after inference at every turn," *Adams*, 139 F.4th at 940, and "surmise and conjecture, without evidence," *Campbell*, 702 F.2d at 266. No rational trier of fact could find the elements of wire fraud beyond a reasonable doubt on this record. In the alternative, should the Court conclude the government's evidence sufficient to sustain the verdict, the defense

nonetheless asks for a new trial.  The verdict is against the weight of the evidence, and the manner in which the jury was permitted to use the first-loan evidence compounded that error rather than cured it.

WHEREFORE, Officer Adams respectfully requests that the Court grant the reserved motion for judgment of acquittal, vacate the verdict on Count 1, and enter a judgment of acquittal pursuant to Fed. R. Crim. P. 29.  In the alternative, should the Court deny that motion, Officer Adams respectfully requests that the Court vacate the judgment and grant a new trial on Count 1 pursuant to Fed. R. Crim. P. 33(a), and grant such other and further relief as the interest of justice requires.

Respectfully submitted,

SCROFANO LAW PC

By:    _____
Joseph A. Scrofano
Bar no.: 994083
600 F Street NW
Suite 300
Washington, DC 20001
Ph: 202-870-0889
jas@scrofanolaw.com
*Counsel for Roberto Adams*